I am Ricardo Quintanilla, attorney for petitioners Juan Vasquez and Fernando Vasquez. Both are men from Guatemala. Juan Vasquez is 46, Fernando is 38. Both reside in San Bernardino, California. This is a unique case because each person is family to the other one, are siblings, and they came first in 1998 with the tourist visas that were obtained with the assistance of the Guatemalan government and the U.S. government. In 1999, the FBI went to their home and said, you gotta go back to Guatemala and testify as you promised to you against this person who killed one of your friends, and they did so. In 1999, they went back. I think we all know the facts here, so since you don't have a lot of time, I would like you to jump to the issue of regarding the minor and who was before the IJ and the BIA as in a derivative application, and you appear to claim and argued below, I believe, that the minor should not be stuck with the findings of the majors or the adults. And so why don't you give me, you know, I realize that there is some precedent out there, but I think the BIA said in the case of the minor that because it was the derivative application that, and also because the minor was accompanied as opposed to unaccompanied, what is your best argument that he should have a separate determination? Your Honor, as to the minor, I would be happy to address that, but I believe that issue is moot because the minor, his father, and also his mother, those cases were severed from this case. There are only the cases of two petitioners who are before you, the case of Juan Vazquez and Fernando Vazquez, and the panel that decided this case, they basically said that the issues that were before you were only the issues involving Juan Vazquez and Fernando Vazquez, and those are the issues that the court should address. As to the issue whether these two brothers who were witnesses for the prosecution in Guatemala... So what's happened to the minor? Well, the minor, they authorized me to work with government counsel, the minor, his father, and his mother. Their cases were severed, went back to the BIA, and they were in the process to adjust their status. So the case... But when did that happen? That happened, it's a decision taken in 2015, I believe, and I will... Yes, September 15, 2015, the court terminated the cases of Norma Patricia... Did you tell us about that? I'm sorry? Did you tell us about that? Should we know about it? It was an order, it was an order by Judge Reinhart, Judge Tashima, and Judge Rawlinson, who made that decision on September 15 of 2015, and they are the ones who separated... I don't know, for some reason I thought that the minor was still part of this. No, no, not because when that order was issued, their cases were severed from the case of the minor. The issue before you is as to whether Guatemalan men and their families... Well, I know, we certainly are considering that issue, but for some reason I thought that... This is, I would say, I was, I'm surprised to hear this. We're all in our docket to see if something was missed in our docket on this, but just so we're clear, and government counsel, we're going to have to ask you to confirm this, that you're saying the case of Luis Jr. is not before this panel? Yes, because the case was terminated. The court on September 15 of 2015, this court terminated their cases pursuant to a motion made with government counsel to have those cases terminated, so they could go before... All right, well, we'll have to check, because usually the parties notify us of this, that, and then, because obviously, I think we're all prepared to address both the adults and the minor today, and... Right. Are you surprised too? I am. Where in the record is this reflected? It is reflected, for example, on the, on the docket. There has to be... But on another case, on another docket? No. But, all right, we won't waste, we won't waste any more time. Maybe, all right, since I've already spent a lot of time on this, perhaps I could ask the government, is that true? Yes. Should we know about this? After mediation, a motion was made and granted through the court, and it's reflected on PACER. I don't, I wasn't aware of any additional requirements to inform the court in another panel. Okay, well, all right, let's go back, since I've spent a lot of time talking about this, and I think it, we're still prepared to address everything that you have, but we were also prepared to address the, the status of the minor regarding derivative, and we'll figure out why we don't know, and so can we put him back to, say, nine minutes? All right, since, sorry. I think it's the first of all the times I've been here. Usually, yeah. I've got to gain some time back. Well, no, I know, usually it's all of these. Don't bank on this happening again. Yeah, exactly, but yeah, but let's just say, I don't want you to think we weren't prepared. We're over-prepared. All right, we're, we're prepared to do all of it today, but we'll go, but now that, since we've clarified that, we'll go back. Okay, so start, let's go back. Thank you. The issue before you involves two brothers from Guatemala. They came as witnesses with the assistance of the Guatemalan government and the U.S. government. They went back to Guatemala, and the government of Guatemala spirited them away once their testimony was done as a witness for the prosecution. There are three cases that, based on those three cases, the court should, should grant, should grant the petition for review. Okay, so my understanding, though, is that their contention was that they basically had a lack of financial services, and were trying to say that those were extraordinary circumstances. That, that would go, those facts, relevant facts, would go as to the issue, whether they file their, their claim for asylum within a reasonable, a reasonable time, Your file their, their, their asylum within a reasonable time, that would be the, the one. And Al-Ramahi, the holder, discovered to focus on that issue, and, and he found that he, the, the asylum had to be filed within a reasonable time. The arguments on the, and the case where the circumstances, how they came with the assistance of the U.S. government, the assistance of Guatemala, the Spanish-speaking persons, all of a sudden become a strange land, and they don't have the resources, and the key is when they were obtaining their first visa, the question that the government asked them was, don't go to the United States and become a public charge, and so they didn't. By the same time, what are they supposed to hear when they are on this strange land, with strange laws that they don't know? So that was our argument that was raised, and that we presented, but we believe that if they don't qualify for asylum, they still have an outstanding claim to withholding of the move-out, and they should grant it. Right, well there's no doubt that, okay, I think it's undisputed that they went back, they testified that they did all of those things, is, and it appears that the minor, but I'm, I'm assuming here that the government hasn't been willing to intervene on the pack, on behalf of your clients, is that right? But it hasn't, it hasn't done it, I mean. Well, they haven't been willing to, they could if they wanted, right, but. They could, they could. But they haven't done that, so we have to deal with, we got to deal with the asylum law, the withholding, the CAT, all of that, right? That's right, and the focus is on, on the asylum, and the withholding are those two brothers, as opposed to those two witnesses. In Enriquez-Rivas' beholder, this court found the witnesses for the prosecution may be members of a particular social group, and under that holding of Enriquez-Rivas, that is relevant to the case at hand. In the case of Rios-Vilinch, this, this court found that the, the family is the quintessential particular social group, a I believe those two cases are relevant, but to us, all right, in Rios-Vilinch, the court pointed out the Fourth Circuit case of Creston-Valladares. In that case, the court is 632-F3-117, Fourth Circuit 2011, that says that family of witnesses who testify for the prosecution are members of a particular social group. You don't have a social group. That's correct, and so... So you want us to say that? That would be wonderful, Your Honor. Well, I'm not saying we're going to, but that's what you, you're asking us to do, correct? That's what I, what I, what I'm asking you. The, the, the, you have cases within those, you have this case, you had the Hernandez-Rivas, witnesses for the prosecution may be members of a particular social group. You had the Rios-Vilinch, in which relative, the family is a particularly quintessential particular social group. We have Rios that I'm the author of, too, right? That's, that's, that's correct. That one doesn't help you out too much, though. No, it doesn't, but the one that helps me out with is Creston-Valladares, beholder, and that's the case that I would like you to apply, and then make a law prior to this circuit. Would you, would you agree that even if we were to find that your clients are members of a particular social group, you would be affirmed on the alternative ground that you didn't meet your burden of proof of showing inability or unwillingness to control the alleged persecutors in Guatemala? I, I believe that, Your Honor, because you have to key, provide the agency an opportunity in the first instance to address the claim that it did never address. It did address that claim, though, didn't it? It found that your clients hadn't met their burden of proof of showing that the Guatemalan government was unable or unwilling to control the alleged persecutors. They did make a finding as to that, right? That's, that's right, but here is the situation. The immigration judge granted both brothers the claim of withholding or removal, so the BIA was reversing the immigration judge's decision. The immigration judge found that they, they merited the grant of withholding or removal, showing a likelihood of future persecution. So under Navas B.I.N.S., this court cannot uphold an agency's decision on grounds that the agency did not, did not rely. The agency hasn't addressed this particular specific issue in the light of Henrique Rivas, in the light of Belange, or even has even addressed the relevance of Crespin Valladares to the issue. The BIA reversed the immigration judge's decision because government, the government appealed the finding. Otherwise, we wouldn't be here, it is most likely. I will reserve my time in case of rebuttal, and I look forward to government counsel's argument. Thank you. I thank you very much for the opportunity to address you. Thank you very much. Good morning. Good morning, Your Honors. May it please the court, Alison Frayer for the Attorney General. First, I do want to apologize if the court was not aware. The minor, as well as both of his parents, were severed as a result of mediation and are no longer before the court. There are some alternatives to litigation available for Juan Luis and Fernando Rigoberto. The petitioner noted in his opening brief that they are the beneficiaries of an approved family petition, and the visas are available. But I inquired with Mr. Quintanilla, and he said that his clients do not want to pursue mediation, and they instead prefer the petition for review. And so, here we are. On the social group? Yes. Do we need to, for you to prevail, do we need to address that issue, or can we jump over that issue and then look to other, the following things that we have to resolve? The court is not required to reach the social group issue. Instead, it can and should affirm the board's decision on the ground that petitioners have failed to show that the Guatemalan government was unable or unwilling to protect them or to control the unindicted assailants. In fact, the Guatemalan government did everything that it could in order to protect petitioners. After the petitioners came forward and agreed to testify, they were placed under 24-7 police protection in Guatemala, and there were no security incidents or threats at that point, once they were under police protection. One of the petitioners informed the police that he still subjectively felt unsafe. And so, in order to keep them cooperative witnesses, the Guatemalan government took the extra step of bringing them to the United States or arranging their travel to the United States. But nothing had happened once they were under police protection to make them think that that was necessary. It was just that one of the petitioners still felt unsafe. And the Guatemalan government was trying to keep them cooperative and ensure their testimony. Similarly, when petitioners returned to Guatemala to testify, the two petitioners who remained before this court were the witnesses in the murder trial. And when they returned to Guatemala to testify, they were placed under 24-7 police protection and provided with hotel rooms. And again, nothing happened to them. There were no threats or anything of any kind while they were there. Nothing in the record indicates that the Guatemalan government would be unable or unwilling to provide similar police protection upon return. Petitioners testified before the immigration judge that they had not approached the Guatemalan government to ask them anything about what would happen upon return, whether the government would be able or willing to provide them with additional police protection, whether they believed that they would be safe at this point, which at the time of the immigration judge hearing was just about eight years after the trial, so some time had passed. And petitioners made no effort to contact the Guatemalan government to see how they would be treated by the government, at least, upon their return. So from your perspective, what were the facts on extraordinary circumstances that were presented? Petitioners argued that their lack of financial resources to hire an attorney, their lack of English language skills, and their lack of familiarity with this nation's complex immigration laws constituted extraordinary circumstances. However, those factors are present in most asylum cases, and so they're simply not extraordinary. Moreover, one of the petitioners testified, and he contacted an attorney and was informed of the one-year deadline. He couldn't remember if he had done so before the deadline had passed or after, but he had definitely been made aware of the deadline. And when the attorney requested money to represent them, the petitioners were unable to go forward. But the asylum application itself is free. There is no filing fee. And many petitioners do proceed pro se, particularly before the asylum office, when they file affirmatively, as these petitioners eventually did. So a lack of financial resources or English language skills or familiarity with our laws is not extraordinary, but is instead rather common, and therefore cannot excuse the untimely asylum application. And we're talking how much time? Their most recent entry to the United States was in February 1999, and they filed in April of 2003. So their applications would have been due... Four years. Yeah. And they would... Petitioners mentioned today that their manner of entry and that the Guatemalan government assisted in their entry should constitute extraordinary circumstances. But he never presented that facet of the argument to either the board or in his opening brief, so the court should not consider it. So if... Does our en banc decision in Hernandez-Rivas versus Holder change your position on whether the government's position, whether the petitioners have alleged a cognizable social group consisting of men in Guatemala and family members threatened with harm due to their participation in the advance? That would be for the board to answer in the first instance, but no, it does not seem determinative in this case. That case held that the evidence in that record demonstrated that there might be social distinction in the Society of El Salvador of witnesses who testify against gangs. This is a different country. This is Guatemala and there's different evidence in this record, so it's not appropriate to call it a fact based holding. This court's been very clear that social distinction is fact based and society specific rather than a legal conclusion. Also that... If we did find that Hernandez-Rivas potentially impacts that question, wouldn't the right approach be to remand to the BIA on that question? Yes, absolutely. However, Hernandez-Rivas did not affect the... Or did not address the board's determination that the particular social group as formulated before the agency and before this court is impermissibly circular because it is based in large part on the past experience of persecution. And so even if Hernandez-Rivas affects the social distinction determination, the circularity ruling would remain valid. So I guess I'm just trying to understand if it were not remanded, if that... And we assume that they could show a social group. Is there, as this is procedurally and factually presented, a way to affirm? Yes. If the court were to assume that the petitioners were part of a particular social group, then it could and should affirm the board's dispositive determination that petitioners did not show that the Guatemalan government was unable or unwilling to control the unindicted assailants. That finding is determinative of their withholding of removal application. I take it, though, opposing counsel will get up here and say in rebuttal, well, that's why they were sent to the United States, because if everything was hunky dory in Guatemala, they wouldn't be sending them to the United States. What's your response to that? That no government can protect its citizens, especially its witnesses in criminal cases, absolutely. And that the steps Guatemala took demonstrate that they were, in fact, able and willing to protect them and to do anything it took, including removing them from the country where they were in danger. And that petitioners haven't shown that they wouldn't be able to do, that the Guatemalan government wouldn't react similarly upon their return. But if their response to the Guatemalan government is to send them back here, you see what I mean? If they send them to Botswana, then I could say, well, why do they need to be here? But if the solution the Guatemalan government has come up with in this case is when these people are in danger, we send them to the United States. Seems like if they get sent back to Guatemala, if the solution is send them back to the United States, then why would we send them back to Guatemala, I guess is what I'm saying. And so you see the, you've mentioned circular reasoning before, it seems like this is a different type of circular reasoning, but nevertheless, round trip. Or at least circular travel. Yeah. Anything else besides that? Not really. The visas, their second visas, when they were coming back after testifying in Guatemala, noted that they were coming to the United States for a brief period. So the Guatemalan government's never to procure permanent residents of any kind in the United States. So they seem to think that the petitioners could eventually return safely. Well, I have, I have a question, apparently what that, from what you said, and I don't know that this, that petitioners are, and I don't know how wisely because we obviously haven't conferenced on this case, are taking this all or nothing approach that we're going to win here, and then we're not going to, you know, go mediate with the government on another alternative. If they lose here, can they still go mediate with the government? Or is that, is, are you taking the all or nothing? That wouldn't be up to me, it would be up to my client, the Office of Chief Counsel of DHS. I mean, obviously, mediation wouldn't be available once we're no longer before the court. There's nothing to stop petitioners from approaching the Office of the Chief Counsel without federal litigation pending and suggesting alternatives to, you know, alternative avenues to relief. But the Office of Chief Counsel usually views those requests less favorably because, as you say. And to put it this way, if they want to try to cut a deal, they should do it now as opposed to later. Yes. Okay, thank you. Thank you. Thank you, Your Honors. In granting the claim to withholding or removal to my clients, the immigration judge has noted that on the record, administrative record at page 87, said that one of the reasons why the government was not able to protect them was because of the three assailants that my clients have witnessed commit this crime, at least two were at large, and the government of Guatemala was unable to locate or control them. Moreover, the immigration judge said, proof of the government's inability to control this remaining assailants is seen in the government's decision to send respondents to the United States, both before and after the prosecution of the victim, which is the point that Judge Owens made. Well, do you agree, though, even if we think that Enriquez Rivas changes the landscape, do you agree that we can't give you that relief? You'd have to go back and convince the BIA... You'd have to go back to the lower court. That would be fine in any... Well, no, not whether it would be fine. Legally, there's this case called Ventura that it sounds like we don't get to do it in the first instance. That's correct. All right, and you agree with that? I would be in agreement, Your Honor, that that is an option for this court. Right, but if you lose, I mean, I'm assuming your clients decided to play hardball and not seek other relief, or what's the... Well, that is correct. Because there's never any guarantee that you're gonna win. That's right, except taxes and that, that would be the only guarantee for my clients, Your Honor. Horseshoes and handkerchiefs almost counts or whatever, I don't know. But to get to Judge Callahan's point, I mean, I'm a little surprised by the litigation position you're taking, because if this court cannot affirmatively grant you the relief you want, all we can do is give you another chance under Ventura, right? Yes. Well, it seems to me that if there's an ability to resolve this case with the government without going back to BIA, I'm surprised you guys aren't taking that chance, because if it doesn't work, and if you're so confident that we're gonna rule your way, it seems like take a chance, maybe you get what you want now, and if you don't, then we'll send it back to the BIA. I'm surprised you're not, you know, at least giving it a shot here. It's, it's, the clients have not authorized me to pursue that option, Your Honor, and that's, I understand your concerns, and, and that's the fate that my client will, will have. Well, they can either go down in flames, singing, doing it my way, or, you know, we don't, or they can maybe get relief. We don't know, you know, that. Yes, Your Honor. All right, well, it's gone into overtime, and we thank both of you for your argument in this matter, and it will stand submitted. Thank you.
judges: Callahan, Owens, Gilliam